May it please the court? Yes, thank you. Matthew Freitas for Pediatric and Family Medical Center. This case concerns a black-letter principle of administrative law. That is, when an agency departs from a long-standing decision, it must, among other things, provide a reasoned explanation for doing so. And that reason, when there's a departure from a long-standing decision, has to be more detailed than it would be if the departure was happening on a blank slate. Especially, and this applies particularly here, especially when there are reliance interests that must be taken into account. Reliance literally given the force and effect of law, binding effect of law from a particular statute, which I'll discuss shortly. So the question this case presents is whether the Department of Health and Human Services, when it departed from an eight-year long history of having approved a very detailed application by Eisner to include a service site and a number of federal scope of project, and then revalidated that decision based upon fully informed information in detail each and every year for eight years, and then further validated that decision by giving Eisner the benefit of the status that the prior approval gave, which is protection from medical malpractice lawsuits on at least two occasions in those eight years, and then suddenly based upon no new information, based upon no new evidence, based upon no change in circumstance, the agency sends a notice to Eisner without any prior opportunity to abruptly changes the decision it made eight years earlier, and tells Eisner that it's going to take a service site out of its federal scope of project that was doing successfully all the things that Eisner asked for permission to do. So the question is, and maybe it sounds a little rhetorical at this point, but the question is, was it was that arbitrary, capricious, or contrary to law? I just want to dive in here just for a second to get your thoughts on this issue. I understand the malpractice coverage point under the FTCA, but you know, you dismissed the attorney general in the district court, and that seemed to have been the focus of the UOTAS coverage for malpractice claim. The way I understand it, and you can help me understand it if I'm wrong, what you're appealing here is the 2015 letter that said the clinic, the California healthcare clinic, was no longer within the scope of grant to Eisner, and I just don't understand how that has any connection whatsoever to the FTCA or the malpractice issue. Thank you, your honor. The connection was made for us by the federal government in the regulation that it put out to implement the immunity and that protection you just mentioned, your honor. So if you look at 42 CFR 6.6, the government makes the connection for us, and it expressly says, this is 6.6d, only acts or omissions related to the grant-supported activity of entities are covered. That's the connective tissue. That was what the agency created in 1995 to implement the immunity statute that I believe you referenced, your honor, the Federally Supported Health Centers Assistance Act, which extends FTCA-type protections to these deemed entities. So in that time, that was the agency's interpretation of what has to get protected when a federal health center grantee is brought into that deemed status, and what has to get protected, and it says it right there in its own interpretation of the immunity provision in Title 42, Section 233a, it says it has to extend protection to acts or omissions related to grant-supported activities of the entities. And so this, here's the connection to the other federal program that's at issue here, that's 42 U.S.C. 254b, that's the type of entity that Eisner is. It has to submit applications to describe what it intends to do in its federal grant project, and when it did that, which is the decision I'm referring to in 2008, Rule 7 for an approval in 2008, it described the grant-supported activities, and there's no dispute in this case that those activities were, in fact, grant-supported from 2007, March of 2007, to really shouldn't have happened in July 30, 2015, but that's when the agency putatively tries to remove that activity from the scope of the project. I guess what I don't understand is what changed between 2008 when it was first covered to July of 2015. Nothing, Your Honor. There is literally no change in facts, circumstances, evidence. The government's position is that it just re-examined the application from 2007 that it approved in 2008 and came to a different conclusion. And then that's... If I can interject on the point you just made, why isn't an agency allowed to re-examine something it did and come to a different conclusion? Are you saying that's, in this case, arbitrary or is it capricious or contrary to law or all of the above? As a general proposition, Your Honor, an agency can revisit prior determinations and reach different conclusions, but it has to clear certain basic hurdles to do so. And when the decision is longstanding, it has to provide more of an explanation than if it was creating a decision out of whole cloth. And when the explanation that it gives for that departure or that changed conclusion, that explanation has to be rational. It has to connect the facts to the law and show the reasoned decision that it reached. And that's what they don't even clear here. So that connects, I believe, to Judge Wardlaw's question of what changed. Nothing. And so when they gave their explanation, it's a little curious, to say the least, and that's what we believe doesn't clear those hurdles because it's arbitrary, it's contrary to law, and it's counterfactual. And if I may, those are the three points I'd like to explore to show why their effort to change their decision was unlawful here. Any agency can change its decision, but it has to have a reasoned explanation. When it's longstanding, it has to be a more detailed reasoned explanation. And when there are reliance interests rooted in that original decision, the agency has to confront those and explain why, in light of those reliance interests, it's still okay to change things. There's no confrontation of the information that was submitted in support of the decision, and that, in particular, are the needs of a service area that are really dire. This is an inner-city area where the rate of poverty is highest in the state of California, the rate of teen pregnancy is the highest in the state of California, the rate of low birth weight that statistic is the highest in California, and fetal mortality is the highest in all of California. It is an area in dire need of obstetrics and gynecological services. That's what, those are the interests, the ability of Eisner to serve its patients with those needs for the reliance interests and the immunity that having an activity within the scope of your is addressed, except at the very tail end of the denial letter, but not in a way that saves their decision. So, first, the main reasons they apparently articulate, and I say apparently because they're not clearly reasoned, is that Eisner was engaged in something other than primary care when it was in the California hospital site, doing all the things that it detailed painfully in its application. That that's somehow not primary care, and it's not outpatient care, that's sort of the substitution that the government uses, is that outpatient means primary. It doesn't. Primary care, as defined in the statutes that control this case, 42 U.S.C. Section 254B and 42 U.S.C. Section 233A, et cetera, they both make it perfectly clear that gynecology, labor and delivery, gynecological surgery, all the procedures listed in Eisner's application, which is at 2ER157, all of those things are primary care, and the government doesn't get to change the definition of a well-understood term as the basis for its decision. So, that's arbitrary. The other piece that's particularly arbitrary is that the government doesn't give an explanation for its notion that Eisner never explained how its board of directors, its consumer-based, patient-based board of directors, would exercise oversight or control over services that were rendered in a facility that was largely operated by the hospital, but a portion of it was the labor and delivery and emergency obstetrics and gynecology services that Eisner was responsible for. Just a sliver of what the overall hospital provides was what Eisner was responsible for. The government, the letter, the decision to drop the site letter, says you didn't fully explain how the board of Eisner would exercise control. That's their supposed reason, but that's a non-reason. If a reason were given, you would know how to address it and potentially solve it going forward, but it's impossible, and this is the tell, it's impossible to see that letter and understand what Eisner would have had to do differently to satisfy this apparent concern. It really is the hallmark or the textbook example of an unexplained decision. Beyond that, if you go to the agency's own pin, which is slated in the dropping of the site decision at 2ER-188, it slates pin 2008-01. That's the agency's own explanation of what the board of a federal pin is. It describes the role of the board. It's about a paragraph long because there's only one statutory provision, main provision, that speaks to what the board's responsibility is. It has to set the services that a health center provides. It has to determine what services it's going to provide to its population. It has to decide the hours that it's going to make them All of that is completely supported in the record. There's a board resolution in the record that shows that the coverage agreement between Eisner and the hospital was presented to the board, discussed with the board, and approved unanimously by the board. That meets every element of the policy that the agency itself has. That's what I wanted to say on the unexplained piece. Now I want to get to why the decision is actually contrary to law. It has different aspects, which the government might say are its reasons. One of the supposed reasons is that the agency invokes these other denial letters. These are denials of requests for coverage. When a malpractice claim comes in, the health center has to submit a request to the government for coverage of that claim. Those denials that started to happen, even though these were grant supported activities, the office of general counsel at HHS said, one of the reasons for never asking for permission to do this in the right way. Not that you didn't tell us exactly what you were trying to do, not that you didn't get our permission to do exactly what you wanted to do as a federally supported activity, but that you didn't put it in the right form and we didn't respond to it. The activities you're engaged in are different and broader than the ones that we preauthorize and let every health center do without even having to ask for permission to do it. Here's why that's contrary to law. We haven't talked about this piece of the issue you raised, Judge Donato. It's that when a health center that has a federal grant asks to be treated like a federal employee for malpractice purposes, it does it in an application in advance of the year for which it seeks that immunity. That has to be, by statutory mandate, an advance request in determination. The government is saying you didn't ask after the fact. That is precisely the regime that Congress rejected in 1995, a particularized determination process that was invented by the agency before the 1995 legislation. I see my time has expired and I did not ask to reserve any, so I would only take it if it was at the good graces of the court. Why don't we hear from Mr. Santos first and then let me know if you need a minute or so to respond. May it please the court, I'm Josh DeSantos on behalf of HHS. Your Honors, I'd like to begin by taking a step back and explaining how the grant statute works, what it is that plaintiff asked for, why HHS removed California Hospital from the scope of the grant. The Public Health Service Act is a grant program specifically designed for health centers that provide primary care. It has very specific requirements about the health center board. For example, it has to comprise the majority of patients or people representing patients. The grant program is generally not for hospitals. In fact, the statute, when it discusses health centers in a few places, talks about it in contrast to a hospital. Hospitals are different things. What plaintiff sought to do here is submit an application back in 2007. It asked for two things. To expand its grant under the Public Health Service Act in two ways. One, it was acquiring a health center that was located near California Hospital, the women's health center. Then two, it said, we've got this new staffing agreement with the hospital. We're going to staff the whole OB-GYN department and we want to bring that into the grant too. HHS initially, in 2008, approved in a very short form notice. It didn't provide any findings or explanation. It just approved it. Years went by and then plaintiff asked to do the same thing with a different hospital. It entered a staffing agreement with hospital's OB-GYN department. Then asked HHS, I want to put that into my grant too. This was when HHS said, wait a minute, did we do that before? You can't just take a hospital department, label it a health center service site, and put it into your grant. That's when it reviewed again its prior decision, which as the court mentioned earlier, agencies can do. Agencies are entitled to review prior decisions and assess the continuing validity of those decisions. HHS reviewed and said, actually, we need to remove California Hospital from your grant scope because one, you're trying to put in a hospital department into the health center program, which is not what the program is for. It's generally for health centers that provide primary care generally in outpatient settings. Two, your board that has to meet all these very specific statutory requirements doesn't actually control the environment. That's very clear from the coverage agreement. The coverage agreement says the hospital explicitly retains professional administrative responsibility. It can control staffing levels. It can say that a particular Eisner provider has to leave the hospital and not work there. Again, it controls the records. There are many, many ways. The standards of conduct and bylaws. The agency just says in a few sentences, these are the two reasons. Then it explains why it had approved. That was the paragraph that opposing counsel was referring to. Their HHS isn't explaining the reason for removing California Hospital. Their HHS is saying, we understand that we approved it before, but here's why. We had focused on the fact that you were trying to include Women's Health Center. Let's take your reason. Where in the July 30th letter does HHS explain how Eisner lacks control or oversight with the delivery of the services? After the first paragraph, you see that second paragraph. The letter says, as you know, HRSA health center program provides support for delivery of primary and preventative healthcare medically underserved populations. These are generally, I'm reading a little bit further down, outpatient ambulatory care services. Then it talks about, if you read our pin, referring to the pin that opposing counsel also referenced, the board has to retain control, independent control and authority over the provision. That paragraph there is a statement of the agency's two reasons as the district court recognized. Under longstanding principles of administrative law, an agency... Wouldn't you have to say, and you're not doing that? Is that the problem? You're not doing that or we think you're not doing that? Your Honor, I think it's implicit and I think that's definitely enough to uphold a decision under Supreme Court case law. An agency decision must... I don't know. I was a member of the panel that the Supreme Court reversed an Encino motor car. An Encino motor car, the Supreme Court's required a lot more than that. Your Honor, the general principle is an agency decision has to be upheld if its reasoning is reasonably discernible. Here, this paragraph... I'm sorry, I didn't hear. Is reasonably what? Discernible. If you can reasonably... Don't you have to articulate it and have it be rational? For example, the second reason is, and it says, as more fully addressed in the March 2014 letter, EPF Eisner's continuous staffing of California Hospital Medical pursuant to a coverage agreement with the hospital does not fit within FTCA coverage standards. But can't you be a grantee of Section 254B funds without coming within the FTCA coverage standards? Your Honor, that actually highlights a very good point that I want to make. That paragraph that you're referring to is not giving a reason for changing the scope of... That's not a reason? I thought that was a reason. As the district court explained, it isn't a reason for the change in scope. What you can tell, and it's clear when you look at the context... Point to me the language that's the reason. Is there one reason or two reasons? There are two reasons. Show me the language that expresses your reasons. In the letter. The second paragraph of the letter. That's the first reason? That's in both reasons. That's both reasons? That contains both reasons. The first reason is in the first two sentences and the second reason is in the last sentence. Wait, that one paragraph? That one paragraph has the two reasons. If it's helpful, I can give you an outline of what the letter is doing. No, I want you to point to language. You're saying both reasons are in that paragraph. Right. It's the language that I referred to earlier. It's the referencing of the pin? The first reason is where it says HRSA health center program provides support for primary and preventative care regardless of their ability to pay. Services provided by health centers under the health center program grant scope of project are generally outpatient ambulatory care services. That's the first reason. In other words, health center program is for health centers, not for hospitals. The second reason starts with HRSA's policy information notice. Underscores the health center program's emphasis on the provision of primary care services and the role of the health center's governing board in exercising independent control and authority over the provision of health services. There's the second reason. In other words, the board has to retain control. The coverage agreement doesn't do that. What you're looking at is the very same stuff that justified putting them within the program in the first place in 2007 or 2008. That's right. Actually, that's what the third paragraph is addressing. The third paragraph is saying we did approve it back in 2008, but we were focused on your request to add the women's health center, which again is not in dispute. That is properly within the grant scope. In other words, HHS made an oversight. It just didn't realize that it had approved an entire hospital department as a service site within the health center program. Why didn't HHS say we made a mistake? We reviewed this and we made a mistake and we shouldn't have done this in the first place? I think that's what it's saying. Or we went out to investigate and we found that you were providing coverage beyond the primary care that you represented you were providing. That is, I think, what the third paragraph is saying. It's not saying we went out and looked at your place. What it's saying is we, in 2007, did this, but we had focused on the wrong thing. If you view this letter in the context in which it was written, it was written right after a when HHS realized that they can't possibly do this in the health center program. So in context, you can see what the agency was doing. It had already told plaintiffs, Martin Luther King Hospital can't be in the health center program. Now it revisited and said, hey, the same reasons apply here. We really shouldn't have added this back in 2008. I did want to also address this deeming decision. I just want to clear up any potential confusion. So the deeming decision is under 42 U.S.C. 233, and that's a statute whereby the federal government can provide malpractice liability coverage if a health center meets very particular requirements, and it applies to certain grant supported activities. In effect, the deeming decision is like an insurance policy, and it applies to certain services of whatever services the health center is providing that are grant supported. So all the statutory requirements have to be met, but it does not lock in the grant scope. In fact, the deeming decision itself said if your grant is terminated during this year, the deeming will terminate. So every grantee is on notice that the grant can change. In fact, the grant can expand, as the plaintiff itself tried to do and did in 2007. It can contract. It can terminate. The insurance policy type of decision in the deeming decision has no relation to that, as the district court explained. And here I do want to address something that Your Honor, Judge Wardlaw mentioned. That third paragraph, or rather fourth paragraph in the letter, where it says with regard to FTCA coverage. That's how the paragraph begins. That is providing a reason for the change in the scope. That's referring to prior communications about that separate issue of FTCA court coverage, and it says with regard to FTCA coverage, comma. So it's a separate issue, and it's referring back to other communications between the agency and the health center. It isn't a reason for changing the scope of the grant. And I just want to pursue that. I asked your colleague across the aisle there the same question. I read the district court, and in your letter, I did not think the FTC issue, the coverage issue, was related to the termination of the scope of grant, and you agree with that. Is that right? But the next question I have is, why is it in this letter at all? I mean, this letter is purporting to terminate. Why would you sort of veer into an irrelevant issue? That seemed a little confusing to me, and maybe waters down the clarity of the explanation and the reason. Why would you suddenly throw that in? Well, I think, Your Honor, and this actually also touches on a different point. The letter was saying, we're going to give you 60 days, by the way. So the grant remains the way it has been, and you have 60 days until next. I think what HHS is doing by saying, also, as we've also talked about separately, remember, there are other reasons why you wouldn't necessarily get FDCA coverage for services that you're providing at California Hospital. So don't think that because you have 60 days, that means that for these 60 days, you're going to be covered. We've discussed other reasons why you might need coverage. This idea of reliance, which is what the plaintiff has referred to, plaintiff never made an argument about reliance interests. It's not an issue. It also is an argument that it now made about the control. If you look at plaintiff's opening that's not in there. They're contesting the fact that, in fact, the board does control. So those things are forfeited. And just very briefly, because time is short, I also want to mention this. Mr. Santos, I wanted to let you know, occasionally when you turn your head to the side, go back. Your voice is cutting out. Okay. Thank you. I'm sorry. So just briefly, I wanted to mention this challenge related to the particularized determination process. So that is a process under the 42 U.S.C. 233 theming statute. And that's a process whereby HHS can make statutorily required findings that extends a deeming decision to services that a health center can provide to non-patients, people who aren't health center patients. The district court held that plaintiff didn't have standing to challenge that because there are no claims at issue here and the scope decision had nothing to do with that process, as I've explained. Plaintiff does not challenge that dispositive standing holding in its opening brief anywhere. And for that reason, the court may affirm, but also the district court was correct as to its standing holding for the reasons in our brief. Cancel. I know you're over time, but I have a question that I want to ask you. If we were to find this letter did not provide adequate reasons to make a change on this program and reverse the district court, what happens next? So if the court were to hold that it's not sufficiently explained, we think the proper remedy would be for the court to remand without vacating the decision so that HHS can explain. HHS's reasons here were based on statute and policy. Because I noticed that your brief gives some fairly cogent reasons, but those same reasons aren't actually in the letter. Or you say they're implicit in the letter. We think it's sufficiently in the letter under the Supreme Court's really deferential arbitrary and capricious standard. The letter between friends. You have a secret language that only you two can understand, but I don't know if that really helps us. Well, Your Honor, I do think that the letter is short, but it does lay out the two reasons. One being this is for health centers in outpatient settings, and two, you need the control aspect as laid out in our PIN. It is referencing the PIN, which as opposing counsel has all the requirements. Counsel, if I could interject a quick question. I was just curious if the record shows whether or not the government agency here and the appellate foundation have a continuing relationship with regard to other ongoing. So, if I understand your questions, whether plaintiff is still a grantee under the health center program. Yes, that's correct. This letter did not change that. If the parties have a broader relationship, I guess I'd like to ponder whether the parties might help us out by voluntary mediation. It wouldn't be something that we order binding. So, I'm just raising a question. I don't think I'm not asking if the government or the foundation to answer whether they would be interested. Yes, Your Honor. I just do want to say that from the agency's point of view, the fundamental problem here is that this is a health center program that by statute is designed for health centers and it would take additional congressional action before it could include something like a hospital department into the program. It would seem to me you ought to send somebody down here to take a look at what exactly is happening and what exactly is being funded to the Eisner Center's delivery of services at the hospital before you could just assume that it was hospital services. Your Honor, the coverage agreement on its face says this entire department will be staffed by the plaintiff's physicians. It's going to be acute care. It's going to include emergency care, other types of services. People show up who don't even have primary care doctors. See, that's why if it is on the face in the original documents, that's why I don't understand what this letter is saying at all because you could have said no day one. But anyway, it's five minutes and I'll give you a couple minutes, Mr. Freitas. Thank you, Your Honor. I'll try to make a concise point. Number one, I don't think the idea that an oversight was made back in 2008 is really plausible. Council has even demonstrated how clear the coverage agreement is and huge chunks of it are devoted to the description of what Eisner did as well as the change in scope application. Huge chunks of it. Detail, all of these things that a lot of people get skoomish about when you read about these procedures. It was all right there 24-7 call panel, labor and delivery for a hospital. There's just no question. Is labor and delivery not considered primary care? It is primary care, Your Honor. I think the best place to go for the answer to that, Your Honor, is section 254B of title 42 and section 253A of title 42. They both make clear that obstetrics and gynecology, including nurse midwife services, are primary care under the definition of primary care services. And then the immunity that was stripped during the middle of a final and binding deeming period here refers to services in the fields of, among others, obstetrics and gynecology and ensures that these provider types have hospital admitting privileges. So there's no question they can do exactly what they did. The only issue, and it's just, I disagree with counsel, it's not about a lack of authority. It's just about a degree. This center did more of what other centers do and it did that because of the acute needs of its patient population, which are also detailed. So it's not about lacking authority. It's just using the authority for a more services. And that's because there were more unassigned patients who not only didn't have pediatric visits, but they show up in the hospital for their first visit, if you will, pregnant and ready to deliver. That's why in a service area like this, you would allow Eisner to do more than others do. But it's not a question of authority. It's just a question of degree. As far as linking two statutes together, I think it's very important to go to the immunity statute, 233C and go down to 233C1F. And that's the provision that says deeming is final and binding. Two sentence provision, very clear. The second sentence of that provision says, except as provided in subsection I, which you can look at, it's just a different exception that doesn't apply. The secretary and the attorney general may not determine that the provision of services, which are the subject of the deeming determination, are not covered under this section. And so right there, that's saying when you deem a health center, you're deeming it for the services that it provides. The services that Eisner provided and were approved by the 2008 decision were approved in 2014 for the entire calendar year of 2015. And then in the middle of that year, the agency came in and purported to drop the site and the services at it. And what that would do is run afoul directly of that second sentence, both sentences, but more specifically the second sentence in 233C1F. I don't think that's fair. There are other points that I would like to address, but I don't want to take any more. All right. Thank you both, counsel. Pediatric and Family Medical Foundation versus Azar is submitted.
judges: Wardlaw, Gould, Donato